Thank you, Your Honor. All right. We will now proceed to the case of Spinnenweber v. Laducer and Red River Supply Appeal 20-1534. We'll first hear from Mr. Prindy. Yes. Thank you, Your Honor. Yes, I'm Gary Prindy of Tallahassee, Florida. I'm the attorney for Richard Spinnenweber, who was the plaintiff in an action in the Northern District of Indiana on diversity jurisdiction involving a truck accident where his van was rear-ended by a $250,000. And Mr. Spinnenweber refused to accept the $250,000 and requested a new trial. The new trial actually took place. He represented himself. And he's a very unusual guy, I'll say that. In his bench trial, he requested a zero verdict as a moment of silence. I don't know why he did that, but that's what he did. And so here we are, because he believes very strongly this was his first and only trial in his life that he ever was in court. And he got it right and that he wants me to speak on behalf of this jury verdict. So I know the standard is very high on an order granting a new trial. Abuse of discretion is very difficult. But I think there's some things here. This is a very simple little tort case. It wasn't a complex matter where Apple is suing Samsung and there was an eight-month jury trial with 10 or 100 experts testifying. This was a very simple trial where the jury heard from Rick Spinnenweber. They heard from his family and friends and people he worked with. And they heard from not his expert on medical matters, but on the defendant's expert on medical matters because the judge, Magistrate Martin, had stricken his medical experts. So he didn't have any experts, but they did, over the objection of the defendant, they did allow him to call their expert. And so that was presented by a video testimony. Everything was video except there was a law enforcement officer who testified who was at the crash scene. And I asked myself, why did this jury, if the judge thinks they got it so totally wrong, why did they enter a million-dollar verdict? Why didn't they enter a $50,000 or $150,000 or $250,000? And I think the reason they did is because while there wasn't any medical expert directly on point for Mr. Spinnenweber, this jury did get to hear a group of his family and friends, as I said, his mother testified. And they may not be experts in medical things, but I do think they came close to being experts on Richard Spinnenweber and who he was before this truck accident and who he was after the truck accident. And I think that's what the jury saw and heard is we don't know why he is this way, but he certainly is because this man is different than he was. He has memory problems that he didn't have before. He has to post post this to remind himself to do something that he was going to do 15 minutes later. And he's irritable. He's forgetful of lots of things. And he has tinnitus ringing in his ears that he didn't have before. And these people all testified to that. And they said it wasn't like that before this accident. This accident took place May 17, 2012. The trial didn't take place until December 3rd and 4th of 2018. It took six years for this case to get to trial because Mr. Spinnenweber, like I say, he wanted to have a trial. He didn't want it settled. He didn't want it resolved out of court at all. He wanted to have a trial. He wanted to tell his case to a jury. He did. He said he wasn't even asking for emotional pain and suffering damages. What he wanted was he wanted trucker companies like this company to install automatic braking devices on their trucks so that in the future, people like him driving down the road, minding their own business, won't get rammed in the rear end by a semi-tanker. Because the jury heard that. The jury heard from the state highway patrolman or the state policeman that, you know, I measured the skid marks of this semi-truck. They were 723 feet long. That's two football fields to stop that truck. The jury saw and heard and were allowed to touch and feel the trailer hitch that was on the back of Mr. Spinnenweber's van. This thing, a 5,000 pound hitch, was bent down like, you know, somebody, a giant just grabbed it and bent it down perpendicular to the ground. So all that force from that truck that it took to bend that trailer hitch down was sent through that truck into Mr. Spinnenweber's body. That's what happened here. He got rear-ended. He was driving down the road 55 miles an hour looking for an exit lane. And this truck came up in the middle lane and decided to switch lanes. And he told the cop he didn't even see Mr. Spinnenweber. So that's what happened. I think he was barreling along, not paying much attention, but saw there was traffic in front of him and decided to go around it right into the rear end of Mr. Spinnenweber's van. And so Mr. Spinnenweber testified to that. I mean... Well, was this based on punitive... No, Your Honor, it wasn't based on punitive damages. In fact... Well, everything you've just said sounds like it's punitive. And I understand that, Your Honor. It's... This is one of the reasons why, as an attorney, I'm concerned about this because what this looks like to me, you know, I had nothing to do with the case. Just said it doesn't really matter what happens at this trial because at the end of the trial, the judge will have the opportunity to just fix it. So I get a mulligan on whether I decide to object to closing arguments that raise these kind of issues. I mean, the lawyer for the plaintiff asked for a million dollars and the jury gave him a million dollars. The defense lawyer, even though his own expert who testified described medical damages, said give him $20,000 and 2,800 bucks for some travel change. I think that's the kind of thing that motivates a jury to say, you know, we don't put any stock in anything that defense lawyer says. If he had said, give him $100,000, give him $150,000, they might have said, that's reasonable. But they didn't. They just said, this guy doesn't know what he's talking about. Because how did they do this? There wasn't prejudice here. I mean, this isn't a case of Mr. Spinnenwebers from Hammond, Indiana and the trucking company from North Dakota. And, you know, we just say, hey, can't let these out of staters come in here and run into our people. This is a man from Florida. He had no standing with that jury. He's just a guy trying his case in the Northern District of Indiana and they award him a million dollars. And I asked myself, that's been the puzzle. Why? And I think it's because they heard the, his friends, his family, his mother describe how different he is and said, we don't, there's injury here. And those people, they're experts on that. Like I said, there are experts on him. And that's what they went with because there's, there has to be some explanation for why that happened. You can't, they didn't go in there. They only deliberated for an hour. So they came out with a clear idea of what they wanted to do. And that's why I'm harping on. It's a simple negligence case. Cause I was reading these cases on motions for a new trial. And that's one of the factors you look at is, you know, why did the jury in the judges? I get it wrong. Was it a really difficult case? That's beyond the comprehension of jurors. No, this was not. Jurors drive on the roads every day. Jurors know what happens to car accidents. And so there wasn't anything difficult here at all. They just said to themselves, we're going to award this man money. I see my time is up. Thank you, Your Honor. All right, Mr. Prendy, your time is up, but I'll give you two minutes for rebuttal. Thank you, Your Honor. All right, Mr. Brandenburg. Good morning, Your Honors. May it please the court. All parties in this case agree that this matter should be reviewed under an abuse of discretion standard. Generally an abuse of discretion only occurs where no reasonable person could take the view adopted by the court. Judge Martin sat through this trial, heard all of the evidence and had a reasonable basis to conclude that the verdict of $1 million was not supported by the evidence. Notably, when discussing the standard of review in the appellate brief, the appellate cites to the case Huff v. White Motor Corp for the alleged proposition that a verdict should not be disturbed if the verdict leaves the court with the uncomfortable feeling that the verdict is too high. The citation to this case is not relevant to this matter and an incomplete statement of the law because the Seventh Circuit in the Huff case was actually reviewing a trial court's denial of remitter and indicated that it would not disturb the finding of the trial court despite the fact that it was uncomfortable with the verdict. In fact, the Seventh Circuit stated, we would not have awarded $700,000 if we had been the jury and we might well have set aside the verdict or ordered a remitter had we been presiding at trial. In the Huff case, this court was giving deference to the trial court on denying a remitter. Here, the court entered a remitter because having heard all of the evidence, the court made a reasonable decision to conclude that that verdict was simply too high and not supported by the evidence. The deference given to the trial court in Huff should be given in this case. Here, the trial court reviewed all the evidence and made a determination that it was excessive because there was no rational connection between the award and the evidence and the award was not comparable to similar cases. The reason this, Appellate's counsel has indicated that this case is not a complex one. It's just a simple tort matter. But the issue of damages in the case and Mr. Spinaweber's claim of a permanent injury is a complex matter. Mr. Spinaweber did not request any medical treatment at the scene of the accident. In fact, he drove from the accident in the same van that he was rear-ended in all the way to Michigan, attended three days of go-kart races, then drove 1,000 miles home to Florida before seeking any medical attention. And at that time, his medical attention was only claims for neck injuries. It was not until months after the accident that plaintiffs started to make a claim of ringing in the ears for tinnitus and started to claim that he had some sort of brain injury. There were no treaters that were deposed in the case that would actually relate an alleged brain injury to the accident. That's the reason that no treaters testified to it. And while Appellate's counsel claims this isn't a complex matter, it is not in the purview of a layman on the jury to look at an accident and make a determination that someone in fact had a traumatic brain injury in that accident when there was no objective finding to support that injury. The only expert to testify in this case, and it was over the objection of Red River Supply, was Dr. Carney. And Dr. Carney's testimony in the case was simply his for an extended period of time. But Dr. Carney only testified to a temporary whiplash injury and potentially a minor concussion. That potential of a minor concussion, he did not relate to a permanent brain injury or any of the ongoing symptoms that Mr. Spineweber and his family and friends presented testimony to the jury. So once the trial court heard that verdict of $1 million, the trial court made a determination that, yes, the jury had heard testimony from family and friends that Mr. Spineweber had been permanently changed by the accident. But the underlying foundation for those changes, that being a traumatic brain injury, was never actually presented to the jury. And therefore, the foundation for any type of permanency was not placed before the jury. And the million-dollar verdict could have only been One, the jury was trying to punish the trucking company based upon the improper arguments of plaintiffs' counsel in closing, or because the jury relied upon the speculative improper opinions of Mr. Spineweber's family and friends that he, in fact, had a brain injury and permitted injury from the accident. A $1 million verdict is not reasonably connected to a temporary whiplash injury, which was the only injury for which there was evidence actually put before the court. One issue I wanted to address is in Appellant's reply brief, he cites to a case Smith v. Beattie for the first time. And that was a case where the Indiana Court of Appeals overturned a directed verdict for defendants in which the plaintiff had an objective injury of five fractured ribs, but the treater could not say exactly whether those fractured ribs occurred when he rolled his van or when he was struck by the semi. And that testimony of the objective injury combined with his testimony that he did not have pain until he was struck by the semi, the court determined was sufficient to at least place the issue before the jury. Smith v. Beattie, however, is not a case that this court should follow because it's distinct for two reasons. One, it was a review of a directed verdict for the defense. And two, that case was later distinguished by Topp v. Leffers, which was cited by the Appellees in their brief on the basis that subjective injuries, such as the complex subjective injuries, such as in the Topp case, an aggravation of back pain from a rear end accident, require expert testimony. Well, this case is one of a brain injury in which there is simply no objective injury that could be viewed by anyone. If any case were to require expert testimony to support a claim of permanent injury, that would be a brain injury case. It takes a brain surgeon to figure out, or a neurologist, to know whether a traumatic incident resulted in a brain injury to a defendant. That was not present in the case. And Judge Martin. Excuse me, Mr. Brandenburg, is it correct here that adding to that potential complexity, there were records that Mr. Spinnen Weber had had some prior head injuries? Correct. Dr. Carney addressed that in his testimony. He'd had four or five previous head injuries, including one where there was a visible hematoma in the CT scan. Here there was no CT scan after the accident because it was so many days after the accident before Mr. Spinnen Weber even sought treatment. And it was months before he tried to claim a head injury. So here you've got a previous history of head injuries, which Dr. Carney explains, and you've got the distance in time to when the head injury was claimed after the accident. It would certainly take a medical expert to opine on that issue to place the issue before the jury appropriately. And for that reason, Judge Martin appropriately determined the only injury that was supported by the evidence before the jury was a temporary whiplash injury and potentially a short-term concussion. And in the judge's view, $1 million was not reasonably connected to those injuries and could, while we can only speculate as to why the jury reached its verdict, it has to be either they were believing on the speculative nature, family and friends testimony that he had a brain injury, or they were attempting to punish the trucking company. Counselor, did you participate in the second trial? I did participate in the second trial. It seems somewhat unusual. He presented no evidence. Tell me what, how that trial took place. What happened? Well, about a month or two before the trial, Mr. Spinnen Weber filed a motion asking to remove the jury trial component. And at the time it took, it took a week or two after that before we could get authority to waive a jury trial. So originally the second trial was supposed to be a jury trial, but that ended up being waived by Mr. Spinnen Weber and it proceeded as a bench trial. At the trial, Mr. Spinnen Weber proceeded to represent himself, at which point he made a speech at the beginning of the case, seeking a symbolic verdict of zero dollars, apparently lamenting the fact that the jury's verdict had been overturned. And because of that, we moved for a directed verdict as he presented no evidence and no witnesses and the jury and the trial judge entered a directed verdict. The trial judge was a magistrate judge? Correct. Judge Martin. All right. Thank you. If the court has no further questions, I'm out of time and would simply ask the court affirm the ruling of the trial court. Thank you, Mr. Brandenburg. Mr. Prenti. All right. Thank you, Judge Fahm. Well, I, I do personal injury law and as I understand it, you take the plaintiff as you find him. If Mr. Spinnen Weber had previous brain damage as identified, testified to under oath by Dr. Carney, then that is permanent, that's brain damage. And the jury saw or heard that from him, that's coming from the defense's expert, not the plaintiff's expert, that he's got brain damage. He's got prior brain damage. He's got exacerbated brain damage because you're getting a concussion on top of your prior brain damage is what this, the jury heard. And we can't allow the argument that, well, deterrence wasn't a fact. The guy didn't object to that. So you're saying, well, if the defense lawyer lets a guy make an improper argument, even though that a plaintiff's attorney cited case law to the effect that in Indiana, one of the purposes of state tort case law is deterrence in all cases, not just punitive damage cases, but be it as it may, there's no objection. So you get to say, I don't even have to object and I win. I mean, heads I win, tails you lose for the, on the defense side, because the judge is going to clean it up anyway. I mean, I just don't think- That's a pretty high risk strategy. Well, it worked here and I- Right. But what else can there be? I mean, you're basically saying screw up all you want and they'll take care of you. I mean, I'm sorry, judge, if you had a question, but I guess I just, that's my concern is, we're supposed to have a trial is the main event. You want that to go right. Everything's supposed to go right in the trial. If one lawyer is going to say, I don't really feel like getting too fired up about this trial anyway, because I know it's in federal court and they'll take care of me and wipe out this judgment if it's a bad one. Who cares? That's just not good policy. I mean, we want- Counsel, can you tell me what's the effect of this second trial? You know, your honor, I couldn't find, and I don't know if Mr. Brandenburg could either. This is a situation that just does not come up, obviously. I agree. I mean, you know, because, and I tried to tell my client that, that, you know, where you're in federal court here, that judge, the way I explained it to him was this. I said, when your lawyer got a million dollar verdict, he had done his job because you got leverage. But he just, I actually think he's, there is some real truth to the damage that he suffered in this thing, because I told him, I personally told him, you know, I got hired right before that. And I said, now I want to take up all your, go over your time, but I told him, just go in there and say, judge, you have previously determined that the evidence in this case is worth $250,000. So I'm starting from there. You know, I want a million dollars. That's all you got to say. I want a million dollars. That's what the evidence said in the first trial. I want you to just read it again and give me a million dollars. So we don't have to go through the bother. I'm going to read the entire transcript of the trial again. And well, you see, he didn't go with that strategy. He told me he woke up that morning and just came to him. Whatever bed you were sleeping in, get a new one. But anyway, I, in closing, I want to say this, this is my first, maybe it's my last ever case in the Seventh Circuit. I just been a lawyer for almost 40 years. So this is a great honor to appear in this court. And I once met Judge Bauer at a NIDA trial, NIDA trial thing in Gainesville when I was in law school. That was 38 years ago. That tells you he's obviously been around a long time because he, he was there at that 38 years ago. And I gave a ride to the airport as a student to Judge Marvin Aspin. I was going to, I just wonder if y'all know him, if he's still around up there. He's a nice guy. He promised to buy me lunch if I ever got to Chicago again, and I haven't made it back. I was hoping that, you know, before this COVID thing, I would get to come up there and actually appear in the Seventh Circuit Court of Appeal, many times in the Eleventh Circuit in Atlanta. You should call Judge Aspin when you're in Chicago and ask him for White Sox tickets. There you go. All right. Well, and I do want to say you have a very beautiful Seventh Circuit Court of Appeal certificate that you get. It's much better than the Eleventh Circuit's. I'll just tell you that. It's got the color on it. And anyway, thank you very much. Thank you, Mr. Prendy, and thank you, Mr. Brandenburg, for your respective arguments and the cases taken under advisement. Thank you. Thank you. All right. The Court, just for the record, the next case will be taken on the briefs U.S. v. Ford, Appeal 1934-86. The Court will stand in recess.